J. S66032/18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  K.V.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF:  W.S., FATHER | : | No. 1615 EDA 2018 |

Appeal from the Decree Entered April 30, 2018,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000671-2016,
CP-51-DP-0001418-2014, FID#:  51-001374-2014

BEFORE:  GANTMAN, P.J., PANELLA, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED DECEMBER 18, 2018**

W.S. ("Father") appeals from the April 30, 2018 decree entered in the Court of Common Pleas Philadelphia County, Family Court Division, involuntarily terminating his parental rights to his dependent child, K.V.S., female child, born in November of 2008 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(1), (2), and (b).  After careful review, we affirm.

The trial court set forth the following:

> On May 1, 2013, the Department of Human Services (DHS) received a General Protective Serv[ice]s (GPS) report alleging that [Child] was fo[u]nd nude and w[a]ndering unsupervised, that [Child] had been w[a]ndering for approximately thirty minutes.  [T]he Philadelphia Police Department (PPD) was able to locate [Child's] mother with assistance of the neighbors.  The report also alleged that Mother had a history of drug use.  Mother stated [Child] had crawled out of the window.  The report was substantiated.

On May 1, 2013, DHS received a [s]upplemental report alleging that a similar incident had occurred on April 25, 2013, that [Child] had been found wandering without supervision approximately one block [from] her home[,] that the PPD had been called[,] that the PPD returned [Child] to Mother and Mother had stated that she had fallen asleep on the couch and when she woke up[, Child] was gone.

On May 2, 2013, DHS received another supplement to the May 1, 2013 GPS report alleging that [Child] had again been found wandering outside her home without supervision. The report stated that the PPD was called and returned [Child] to Mother. Mother appeared disoriented and under the influence of an unknown substance.

On June 14, 2013, DHS received a GPS report alleging that Mother fell asleep and [Child] walked out of the home. [Child] was found alone, blocks away from the home and escorted home. The report alleged that this was the third time that [Child] had left the home unbeknownst to Mother, who did not appear to be under the influence of drugs and alcohol, but needed to secure the doors and windows to ensure [Child's] safety. The report was substantiated.

On February 12, 2014, DHS received a GPS report alleging that the family had previously resided [on] Wishart Street in Philadelphia, where the home lacked heat and gas service and Mother fell through the floorboards. The report also alleged that [F]ather moved from the home after he was diagnosed with a serious health problem because the home was too cold for him. Father allowed Mother and [Child] and her sibling to remain in the home. Father moved to a studio apartment and [allowed] Mother and the children to temporarily reside there in order to bathe. Father had recently been paroled from prison after being incarcerated for four years as a result of being convicted of charges related to domestic violence against Mother. The report further

alleged that [Child's] sibling ran away because she felt uncomfortable around Father due to previous issues of domestic violence between Father and Mother. Mother, [Child] and [Child's] sibling were transient and residing with a family friend [on] Martha Street in Philadelphia at the time of the report. The family friend used marijuana and Mother refused to reside in a shelter. The report alleged Mother was diagnosed with depression, anxiety, Bipolar Disorder, and a seizure disorder and it was suspected that Mother's seizure disorder was a result of being physically assaulted by Father.

[Child] was diagnosed with Bipolar Disorder and had suffered due to her exposure to Mother's issues with substance abuse and domestic violence. [Child] attended therapeutic daycare at People Acting to Help (PATH). This report was substantiated.

On June 11, 2014, Father telephoned DHS and reported that [Child] was with Mother and that Mother was under the influence of an unknown substance.

On June 11, 2014, DHS telephoned Mother. Mother's speech was incoherent and she could not form sentence [sic]. DHS notice[d] that [Child] could be heard in the background. Mother abruptly disconnected the telephone call and did not answer when DHS telephoned a second time.

On June 11, 2014, DHS obtained an Order of [P]rotective Custody (OPC) for [Child] and her sibling and placed them with their Maternal Aunt.

At the Shelter Care Hearing held on June 13, 2014, Judge Joseph Fernandez lifted the OPC and ordered the temporary commitment of [Child] to stand. The Court ordered that Father receive supervised visits at the agency; that DHS to ensure [sic] that all prescriptions are filled as to [Child] and that DHS explore all family members.

DHS learned [Child] had been diagnosed with Attention Deficit Hyperactivity Disorder ([A]DHD) and Bipolar Disorder. [Child] was attending mental health treatment through Northwest Human Services (NHS). Mother had a history of mental health issues and drug and alcohol issues, for which she attended Northeast Treatment centers (NET) for outpatient therapy. Mother had been diagnosed with anxiety and depression. Father was minimally involved in [Child's] care and Father had a history of drug use and lacked appropriate housing.

Father filed a petition with Domestic Branch of Family Court seeking custody of [Child].

Father pled guilty to aggravated assault and was sentenced to serve one year and six months of incarceration and seven years of probation on September 23, 2010. Mother was the alleged victim of the assault.

Father pled guilt[y] to endangering the welfare of children and recklessly endangering another person on October 30, 1990 and May 3, 1991.

Father was found guilty of drug-related offenses on April 28, 1997 and September 11, 1997.

At the Adjudicatory Hearing held on June 23, 2014, Father appeared before the Honorable Jonathan Q. Irvine who adjudicated [Child] dependent and committed her to DHS. The Court ordered that Father receive twice weekly supervised visits at the DHS and/or provider agency as arranged by the parties, which could be modified. Father was referred to the Clinical Evaluation Unit (CEU) for an evaluation, a full drug and alcohol screen, and monitoring. Father was ordered to comply with all FSP objectives, services and recommendations.

On September 16, 2014, DHS held a Family Service Plan (FSP) meeting. [T]he goal identified for [Child] was placement with a fit and willing relative. The objectives identified for Father were: 1) to achieve

and maintain recovery from drugs/alcohol by attending Alcohol [sic] Anonymous (AA) meetings; 2) to assist with meeting [Child's] daily needs including food and clothing and 3) to continue to comply with probation officer's directives. Father attended the meeting and signed the FSP.

On September 23, 2014, CEU completed a Progress Report regarding Father stating that he completed a drug and alcohol assessment on August 27, 2014. Father had been referred for outpatient treatment at the Wedge Medical Center Frankfort, and that he was scheduled to attend an intake appointment on September 26, 2014. CEU recommended the Father attend that scheduled intake appointment at Wedge Medical Center.

At the Permanency Review Hearing held on October 20, 2014, Father appeared before Master Alexi Ciccone, who ordered that [Child] remain as committed. The Court ordered Father to be []referred [to] the CEU for an assessment and full drug and alcohol screen. The Court furthermore ordered Father to comply with all FSP objectives, services and recommendation; Father's supervised visitation schedule be modified to unsupervised day visits in the community as arranged; Father was not allow to allowed [sic] Mother to participate in the unsupervised visitation schedule. The Court held that [Child] was doing well. [Child] was receiving services through NET; and Father was referred to the Wedge Medical Center for Services.

On December 17, 2014, DHS revised the FSP. The goal identified for [Child] was changed to return to parent, guardian, custodian. The objectives for Father were: 1) to make sure children are clean and appropriately dressed; 2) to keep all visits and maintain regular contact with [C]hild; 3) to meet regularly with agency social worker and follow through with Individual Service Plan (ISP); 4) to continue to comply and follow the recommendations of the probation officer (PO); 5) to enroll in and regular[ly] attend a General Equivalency Diploma

(GED) program; 6) to stay employed or seek job counseling and referral; 7) participate in mental health evaluation; 8) to sign authorization form to allow the Children and Youth Division (CYD) to obtain copies of evaluations and progress reports; 9) participate in evaluation for drug/alcohol abuse and continue to attend AA meetings; 10) comply with all treatment recommendations of provider; 11) locate and occupy suitable housing for family with the suitable space, heat, and all other operable utilities; 12) to receive appropriate medical evaluation; and 13) comply with all recommended treatments.

On January 9, 2015, CEU completed a progress Report regarding Father stating that he completed a drug and alcohol assessment on November 19, 2014. Father stated [he] had been referred for outpatient treatment but CEU was unable to secure funding for treatment due to his private insurance through Medicaid A&B. Father was advised to contact the Behavioral Health on the back of his insurance card to arrange for a pre-certification evaluation. Father was to contact CEU after securing treatment in order for CEU to monitor his treatment. CEU recommended that Father provide verification of his enrollment in treatment.

At the Permanency Review Hea[r]ing held on March 9, 2015, Father appeared before Judge Irvine who ordered [Child] remain as committed. The Court ordered Father receive unsupervised visits every Sunday and that Father be referred to the CEU for a full drug and alcohol screen, a dual diagnosis assessment, and monitoring. The Court held that Father had made no compliance with the permanency plan.

On June 16, 2015, DHS again revised the FSP. [T]he goal identified for [Child] was changed to return to parent, guardian, custodian. The objectives identified for Father remained the same as the previous FSP. Father participated via telephone.

A[t] the Permanency Review hearing held on June 29, 2015, Father appeared before [J]udge Irvine, who ordered that [Child] rema[i]n as committed. Father receive[d] supposed visits with [Child] and be [sic] referred to the CEU for a drug screen, three random drug screens, assessment, and monitoring. [T]he Court held that [Child] was receiving therapeutic services and med management.

In May 2015, Father tested positive for cocaine and his visits with [Child] were reversed to supervised visits at the provider agency.

On September 16, 2015, CEU completed a Progress Report regarding Father stating that he presented at CEU and rendered a Urine Drug Screen (UDS) on July 1, 2015; Father failed to appear at a scheduled appointment to provide verification of his enrollment in drug and alcohol treatment on July 17, 2015; Father had no further contact with CEU. CEU recommended that Father receive a substance abuse assessment immediately following the scheduled court hearing on September 18, 2015.

At the Permanency Review Hearing held on September 18, 2015, Father appeared before Judge Irvine who ordered that [Child] remain as committed [and Child] be referred to Behavioral Health System (BHS) for consultation and/or evaluation. The Court ordered Father receive therapeutic visits until [Child's] behavior becomes stabilized. Father was referred for anger management counseling and referred to the CEU for a drug screen, a dual-diagnosis assessment, monitoring and three random drug screens. The foster parent request [sic] an Individual Education Plan (IEP) for [Child].

At the Permanency Review Hearing held on December 7, 2015, Judge Irvine ordered that [Child] remain as committed and Father's visits remain suspended. [T]he Court held that [Child] was doing well in placement and at school. [Child] receive [sic]

a psychiatric evaluation through Northwestern Human Services (HS). The Court ordered [Child] to be moved up to treatment level foster care and maint[ai]n a scheduled appointment for wrap-around services on June 16, 2016. Father failed to comply with his FSP objectives.

On December 7, 2015, DHS referred Father to the Achieving Reunification Center (ARC) program.

On December 14, 2015, DHS again revised the FSP. The goal identified for [Child] was changed to Permanent Legal Custody (PLC). The objectives identified for Father remained the same as the previous FSP. Father attended the meeting and signed the FSP.

On February 6, 2016, Mother died.

On February 23, 2016, the ARC program completed a Parent/Caregiver Status report regarding Father stating that he has attended 3 out of 5 anger management workshops. Father failed to attend Parent Action Network (PAN) since his scheduled start date of January 7, 2016 and he had failed to meet with his reunification [s]upport specialist (RSS) on February 22, 2016. Father did not address the goal of parenting education.

At the Permanency Review Hearing held on March 7, 2016[], Father appeared before Judge Irvine, who ordered that [Child] remain as committed and granted a continuance as a result of his counsel's failure to attend.

At the Permanency Review Hearing held on May 13, 2016, Father appeared before the Honorable Lyris F. Younge, who ordered that [Child] remain as committed and that Father [be] referred to the CEU [sic] of drug screen, three random drug screens, an assessment and monitoring. The Court held that [Child] was receiving therapeutic services and medication management.

> On or about early July 2016, Father was incarcerated for violating probation.
>
> A[t] the Permanency Review Hearing held on July 13, 2016, Father appeared before Judge Younge, who ordered that [Child] remain as committed. Father was ordered to receive supervised visits at [Child's] discretion. Father was ordered not to have contact with the foster parent or foster home. The Court issued a Stay-way [sic] Order as to Father regarding the agency's case manager and issued a No Contact Order as to Father to include telephone contact and/or text messaging until further order of the Court.
>
> The matter was the [sic] listed on a regular basis on the docket of the Philadelphia Court of Common Pleas, Family Court Division-Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and evaluated for the purpose of reviewing the permanency plan of the children.
>
> In subsequent hearings, the Dependency Review Orders reflect the Court's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.
>
> On April 30, 2018, during the Termination of Parental Rights hearing for Father, the Court found by clear and convincing evidence that Father's parental rights as to [Child] should be terminated pursuant to the Juvenile Act. Furthermore, the Court held it was in the best interest of the [C]hild that the goal be changed to [a]doption.

Trial court opinion, 7/18/18 at 1-5.

The record reflects that on May 29, 2018, Father filed a timely notice of appeal, together with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court then filed its Rule 1925(a)(2)(ii) opinion.

Father raises the following issues[1] for our review:

> [1.]  Whether the Trial Court erred by allowing the Department of Human Services to move forward with and complete their case in chief without Father's appearance or participation during the hearing[?]
>
> [2.]  Whether the Trial Court erred by terminating the parental rights of Appellant, Father, under 23 Pa.C.S.A. § 2511 subsections (a)(1) and (a)(2)?
>
> [3.]  Whether the Trial Court erred by finding, under 23 Pa.C.S.A. § 2511(b), that termination of [Father's] parental rights best serves the Child's developmetal, physical and emotional needs and welfare?

Father's brief at 4.

Father first complains that the trial court erred when it bifurcated the termination hearing and permitted DHS to present its case-in-chief in Father's absence.

> We note initially that neither the Adoption Act nor the cases interpreting it require that a parent must be present in order for a court to grant a Petition to Terminate Parental Rights.  The Act merely requires that "[a]t least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as the court may require."  23 Pa.C.S.[A.] § 2513(b).  **See In re K.B.**, 2000 PA Super 355, 763 A.2d 436, 440 (Pa. Super. 2000) (finding affidavits of service support trial court's finding that the parents received notice of parental rights termination hearing).

---

[1] We have re-ordered Father's issues for ease of discussion.

> Once a court is satisfied that a parent has received notice of the hearing, it is then entirely within the trial court's discretion to make a ruling on the continuance request based on the evidence before it. As in all matters involving parental rights, the best interests of the child are paramount. Accordingly, the exercise of the trial court's discretion includes balancing the evidence submitted in support of the request against other relevant factors, such as a parent's response and participation, or lack thereof, in prior proceedings and appointments important to the welfare of the child. Most importantly, the trial court is in the best position to factor in the impact that further delay will have on the child's well-being.[Footnote 4]
>
>> [Footnote 4] The trial court's consideration in granting or denying a continuance in a parental rights termination proceeding necessarily will include consideration of the amount of time that will lapse before it is able to schedule another hearing, and the impact that that further delay will have on the child's security and welfare.

*In the Interest of D.F.*, 165 A.3d 960, 965 (Pa.Super. 2017), *appeal denied*, 170 A.3d 991 (Pa. 2017).

Here, the record reflects that DHS filed the petition for involuntary termination of parental rights on July 26, 2016, and the evidentiary hearing was originally scheduled for August 12, 2016. Thereafter, nine continuance orders were entered. The termination hearing was then held on November 8, 2017. At the beginning of that hearing, Father's counsel informed the trial court that Father had been arrested on November 3, 2017.

(Notes of testimony, 11/8/17 at 10.)[2]  Counsel further stated that he had secured a bring-down order and had followed up with the prison, but "unfortunately, because of the prison's fire procedure right now, [Father] will not only not be able to participate telephonically, but he will not be able to be present[]." (*Id.* at 12.)  Counsel then moved for a continuance.

The trial court first acknowledged its satisfaction that Father, as well as all parties, had received notice of the hearing. (*Id.* at 9.)  Indeed, Father advances no argument with respect to notice.  The trial court then determined that in light of the history of the case, the case needed to move forward; that except for Father, all parties and witnesses were present; and that it was not willing to continue the case any longer than necessary, but would bifurcate the hearing and hear Father's testimony at a later date.[3] (*Id.* at 13-16.)  Because the best interests of the Child were paramount in

---

[2] We note that the certified record fails to contain the November 8, 2017 hearing transcript.  That transcript, however, is included in the reproduced record.  Additionally, Father and Child's guardian *ad litem*, whose brief Jeffrey C. Bruch, Esq., Child's advocate, joined by letter to this court dated September 21, 2018, cite to the transcript.  "It is well-established in this Commonwealth that it is 'the appellant's responsibility to order the transcript required and ascertain its presence in the record prior to certification for appeal.'"  *Commonwealth v O'Black*, 897 A.2d 1234, 1238 (Pa.Super. 2016) (citation omitted).  Nevertheless, because the reproduced record includes the November 8, 2017 transcript and no party disputes its accuracy, we will consider it.  *See Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012).

[3] The trial court initially scheduled the continuation of the termination hearing for January 5, 2018.  (Notes of testimony, 11/8/17 at 209.)  The hearing was then rescheduled to April 30, 2018.

the termination hearing and because the trial court was in the best position to determine the impact of further delays on the Child, we discern no abuse of discretion.

Father next challenges the termination of his parental rights to Child pursuant to Sections 2511(a)(1), (2), and (b).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, 9 A.3d [1179, 1190 (Pa. 2010)].

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re M.G.***, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the trial court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b)** **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the

> parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

Here, in terminating Father's parental rights under Section 2511(a), the trial court found:

> [W]hat is clear is that, for every case that comes before the Court where a child is placed outside of the care of the parents, there are objectives that are set forth.
>
> And, yes, we want parents to complete the objectives, but it's not just about checking boxes; it's about ensure [sic] that if we take a parenting class, we take an anger management class, that those classes will not just be taken in, but you will see it exercised in the day to day behaviors of the party that was the recipient of the class.
>
> I'm concerned that, even though [Father] has had anger management classes -- I'm concerned because we've had testimony by workers assigned to this case, in particular, Ms. [Vernice] Whitaker[, Child's former treatment foster,] about the nature and tenor of the phone messages left for her by [Father] where he is using expletives and he is using derogatory names in terms of Ms. Whitaker.
>
> I'm concerned because [F]ather does not operate within parameters and boundaries, and that gives me pause when we talk about possibly returning a child into his care.
>
> As we sit here today, [F]ather continues, I believe, to run afoul of anything that the Court may put in place because, as we sit here today, he's in -- he has a bench warrant. He's in probation violation.
>
> And that was just issued April 13th, 2018. So, [F]ather has not demonstrated over a period of time that he would be appropriate for us to even consider reunification.
>
> . . . .

[F]ather just hasn't really made himself available to [Child] because [F]ather continues to find himself in situations where he's just not available, whether it's through incarceration, whether it's because of his actions that causes [sic] us to kind of pause in terms of moving forward with reunification.

And, quite honestly, [F]ather continues to get into his own way in terms of trying to be reunified with this [C]hild.

I find that the testimony of Ms. [Jenna] Cotton was credible. That was the therapist of [C]hild. I find that the foster parents' testimony was credible, and the foster parents said that, after the limited visits -- and I think the last time there might have been a visit might have been in October 2015 -- that there were concerns about the behaviors of [Child] after the visit.

I find that the testimony of Mr. [Britton] Stewart[, the DHS case worker assigned to Child's case,] has been credible, and I don't find the testimony of [Father] credible. I listened to him very intently, and while he is willing to say all that he's done, he's not willing to take ownership of some of the things that, clearly, he has done through the life of this case.

I'm concerned about [Child's] well-being, and I do not believe that [F]ather is capable of being a reunification resource or that it would be appropriate or in her best interest.

Notes of testimony, 4/30/18 at 68-70.

We have reviewed the record and conclude that it supports the trial court's factual findings and that the trial court did not abuse its discretion in terminating Father's parental rights under Section 2511(a)(2). The record demonstrates that Father's repeated and continued incapacity, abuse,

neglect, or refusal to parent the Child has caused the Child to be without essential parental care, control, or subsistence necessary for her physical or mental well-being and that the conditions and causes of Father's incapacity, abuse, neglect, or refusal cannot be remedied by Father.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 73 A.3d at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have

an obligation to see to their healthy development quickly. When courts fail

. . . the result, all too often, is catastrophically maladjusted children." ***Id.***

In determining that termination of Father's parental rights favored the

Child's needs and welfare, the trial court found that

> with every day that passes, [Child] is in a home that has provided her safety and comfort, and she's being nurtured and she's doing well and she's flourishing and she's, every day, getting more and more bonded with her current caregiver, and that is a pre-adoptive home.
>
> . . . .
>
> I do find that [Child], who has been in this foster home for a significant period of time, is bonded and well-assimilated into this family.

Notes of testimony, 4/30/18 at 69, 71.

Additionally, the trial court found Mr. Stewart's testimony to be

credible. (***Id.*** at 70.) Mr. Stewart testified that he has spoken with Child

and that she indicated that her preference was to have no contact with

Father and to remain with her foster family. (Notes of testimony, 11/8/17 at

37-38.) Finally, the trial court determined that termination of Father's

parental rights to Child was in Child's best interest. (Notes of testimony,

4/30/18 at 70.) Our review of the record supports this determination, and

the trial court did not abuse its discretion in terminating Father's parental

rights to Child.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights to the Children under Sections 2511(a)(1), (2), and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/18/18